## DWIGHT L. WING

### v.

## HENRY H. BEACH.

*Negotiable Instruments—Bills—Indorser's Liability—Notice of Dis-*
*honor—Waiver of—Extension of Time without Indorser's Consent—*
*Evidence—Instructions—Verdict.*

1. Where a bill is accepted, payable at a certain bank which is its holder, no formal demand for payment is necessary at maturity.

2. In such a case a tender of collaterals given to secure a general indebtedness evidenced by several acceptances and renewals, of which that in question is one, need not be made.

3. An indorsement on a negotiable instrument, seemingly amounting to an extension thereof, may be shown, in the light of other facts, to have an entirely different meaning.

4. Upon a contention as to whether the indorser of a bill waived notice of non-payment thereof, this court declines to interfere with a special finding in the affirmative.

[Opinion filed February 21, 1889.]

IN ERROR to the Circuit Court of Montgomery County; the Hon. J. J. PHILLIPS, Judge, presiding.

Messrs. CONNOLLY & MATHER and CONKLIN & GROUT, for plaintiff in error.

There may be circumstances of a general nature, or special circumstances which excuse want of presentment, protest and notice, or show an original absence of right to require presentment, protest or notice. Dan. Neg. Inst., Chap. 31.

But no such circumstances appear in this case, unless it be plaintiff's attempt to prove a waiver, which will be considered hereafter.

It is regarded as entering, as a condition, in the contract of the drawer and indorser of a bill, that he shall only be bound in the event that payment is duly demanded, and be notified if it is not made. And in default of notice of non-payment, the

Wing v. Beach.

party entitled to notice is at once discharged, unless some excuse exists which exonerates the holder. Dan. Neg. Inst., Vol. 2, Secs. 970, 1170; Story on Bills, Sec. 377.

Neglect to give notice to the drawer of a renewed bill not only discharges him from liability to pay that bill, but discharges him from liability to pay the prior bill, to satisfy which it was drawn; and this although it be expressly agreed that the taking of such second bill shall not exonerate any of the parties to the first bill until actual payment. Dan. Neg. Inst., Vol. 2, Sec. 971.

The presentment and demand must be made within reasonable hours, on the day of maturity. For the purpose of fixing the liability of indorsers, the bill is payable on demand at any time during these hours. Id., Vol 1, Sec. 590; Id., Sec. 1077; Edwards on Bills, side page 450.

The holder must distinctly show that notice was given on the proper day; it will not suffice to show that it was given on one of two days. Dan. Neg. Inst., Vol. 2, Secs. 1050, 1051.

As to the proper time for the holder to give the indorser notice of non-payment, the settled rule seems to be that when the parties live in the same place, the notice may be given at any time during the day succeeding the day of dishonor. Where they live in different places, it must be deposited in the post-office on the day after dishonor, in time for the first mail · that departs, during convenient business hours, for the place of resid·nce of or business of the indorser. Id., Secs. 1037, 1042; Story on Bills, Secs. 382, 383.

The indorser of a bill drawn without funds does not stand upon the same footing as the drawer. and although the drawer is not, he is entitled to insist on strict demand and notice. Dan. Neg. Inst., Vol. 2, Sec. 1083.

A promise to pay, by an indorser, after dishonor of a bill, made in ignorance of the fact that due demand had not been made or due notice had not been given, is not a waiver. Id., Sec. 373.

The promise to pay must be absolute, by the indorser, in order to operate as a waiver of notice of non-payment. Dan: Neg. Inst., Vol. 2, Sec. 1163.

The burden of proof is on the plaintiff to show, clearly and distinctly, the acknowledgment of liability, and promise to pay the bill. Id., Sec. 1162.

Unless it appears that the new promise was made with a full knowledge of the facts out of which the discharge of the drawer or indorser has arisen, such promise is no waiver. And the burden of making the proof is on the plaintiff. Walker v. Rogers, 40 Ill. 278; Morgan v. Peet, 32 Ill. 281; Trimble v. Thorne, 26 Johns. 154.

When the holder of a bill has collaterals as further security for the bill, he can not make a lawful demand of payment at maturity, unless he actually has the collaterals in his possession at the maturity of the bill, ready to be surrendered. Ocean Nat. Bank v. Fant, 50 N. Y. 474.

It is incumbent on a plaintiff who has received collateral for a note or bill, to produce the collateral or account for it, before he can recover against either maker or indorser. Stuart v. Bigler, 98 Pa. St. 80.

Messrs. Brown, Wheeler & Brown, and R. & B. A. Mc-Williams, for defendant in error.

It is urged that it was incumbent on the holder of these bills to formally present them to the Wing Milling Company, the acceptor, at St. Louis, on the day they respectively matured, and demand payment thereof, and failing in this, the indorsers are discharged from liability. This position is not sound. The drawee having accepted the bills payable at the banking house of Beach, Davis & Co., in Litchfield, Ill., it was only necessary, under any circumstances, to present them there; but in this case, the bankers at whose banking house the same were payable, were the holders of the paper, by the special indorsement of D. L. Wing & Co., and no presentment or demand was necessary.

"If the bill be made payable at a banker's, a presentment there will suffice. And if the bill be accepted payable at a banker's, which banker happens to become the holder at its maturity, that fact alone amounts to presentment. Byles on Bills, see page 167; Parsons on Notes and Bills, Vol. 1, pages

Wing v. Beach.

365, 371; Edwards on Bills and Notes, side page 497; Bank of U. S. v. Oarmeal, 2 Peters, 543; Chicopee Bank v. Philadelphia Bank, 8 Wallace, 641.

It may be stated in general terms that Wing was entitled to notice of the failure of the acceptor to pay, unless—

1. Such notice was waived by the indorser, or

2. The circumstances under which the bills were drawn and the relations of the parties to each other were such as to render notice of non-payment unnecessary.

The declaration filed in this case, and upon which issue was formed, avers that D. L. Wing & Co. waived demand, protest and notice thereof.

A waiver of notice of non-payment may be established, either by direct evidence, or it may be presumed from the acts or declarations of the party entitled to notice, or from the circumstances surrounding the case and the relations of the parties to each other.

The evidence seems to abundantly establish the fact that shortly after the maturity of the bills, D. L. Wing had one or more interviews with a representative of the firm of Beach, Davis & Co. on the subject of the non-payment of these drafts.

PLEASANTS, J.    This was an action of assumpsit brought by defendants in error against Dwight L. Wing and Hamilton F. Downing, partners under the firm name of D. L. Wing & Co., as indorsers of six bills of exchange, differing only in date and amount, of the first of which the following is a copy :

" Office of Wing Milling Company,
$3,000.                                    Litchfield, Ill., June 2, 1884.

Ten days after date pay to the order of D. L. Wing & Co., three thousand dollars, value received, and charge to account of Planet Mills.

To Wing Milling Company,
    406 Chamber of Commerce, St. Louis, Mo."

On the face of each appeared the following acceptance :

" Accepted, payable banking house of Beach, Davis & Co., Litchfield, Ill. D. L. Wing, Tr." And on the back the following indorsements :

" Pay Beach, Davis & Co., or order. D. L. Wing & Co."

" Oct. 8, 1884. Credit by cash, by interest to Dec. 1, 1884, at rate by agreement of 8 per cent per annum, $111.99."

Each of the others was accepted and indorsed in like manner, except that on the second one the amount of interest credited was $408.21, and on all the others the amount was credited generally and not as interest.

Besides the common counts, the declaration contained special counts on the several bills and indorsements respectively, alike in form, *mutatis mutandis*, and averring that the Wing Milling Company was incorporated under the laws of this State, doing a milling business and resident at Litchfield; that the " Planet Mills " was only the name under which the local business of said company was done at that place ; that said company and the Planet Mills were one and the same in all respects ; that said D. L. Wing was president and treasurer of said company and also the active and only resident partner of said firm of D. L. Wing & Co. in said county and State ; and that the defendants, both before and after said bills of exchange became due, waived demand, and protest and notice thereof.

As to the defendant Downing the summons was returned " not found." Wing pleaded the general issue, under which the trial was had, resulting in a verdict for plaintiffs for $38,-118.09. Of this amount they entered a *remittitur* of $500 and after a motion for a new trial overruled, judgment was entered against him for the remainder. He prosecutes this writ of error.

It appears that for some time before these bills were made the milling company transacted its financial business through the defendants in error, who were bankers at Litchfield. In September, 1883, it was owing them about $50,000. Upon their so insisting, D. L. Wing, as its president and on its behalf, agreed in writing to reduce the amount, give them the indorsement of D. L. Wing & Co., and put up $75,000 of its

second mortgage bonds, secured on its property at Litchfield, as collateral security for its paper and renewals thereof which should be held by them, from time to time, all of which he did, and under this arrangement the business relations and transactions of the parties were continued. The regular course of this business was, when a bill became due to take it up with another for the same amount, at ten days, the interest being charged in current account of the company against current deposits. For that purpose, and to avoid delay in renewing, D. L. Wing & Co., by D. L. Wing, indorsed bills in blank, which he left with his brother, Carlos H. Wing, the cashier and general manager of the company at Litchfield, to be by him filled up and exchanged for old ones as occasion required. Of such were those here in suit.

When the first of these, dated June 2, 1884, became due, Mr. Van Deusen, the cashier of Beach, Davis & Co., declined to accept his offered renewal, and told him they could not do business in that way any longer. The others, of which the last was dated June 12th, successively matured in the course of ten days and were all unprovided for. There was no further offer of renewals.

At that time, in consequence of the reduction which was made in the amount of indebtedness, $23,000 of the collateral bonds had been surrendered. It is not claimed, however, that by the agreement of September, Beach, Davis & Co. were at all bound to accept renewals of these bills. From the evidence it would appear that in the meantime material changes in the conditions affecting the value of the securities had taken place, or were by them supposed to have taken place, and it is conceded they were free to refuse an extension of the credit if they saw fit to do so.

This action was commenced in November, 1886, and the defense set up was purely technical—that plaintiffs had not taken the formal steps required by law to fix the liability of defendant as an indorser.

First, that they did not make a sufficient demand of payment upon the acceptor, nor show a lawful excuse for the failure to make it, or any waiver of it by the defendant.

There was no evidence of any formal demand upon either of them on the day it became due, except the first, as to which each of two witnesses, Mr. Van Deusen and David Davis, stated that when Carlos Wing came on that day to renew it, he, the witness, made the demand ; and Wing contradicted the statements.

It is also contended that such demand, if made, was insufficient unless the collaterals were then produced or shown to be in possession of the bank, to be surrendered on payment of the bill, of which there was no proof.

But where, as here, a note or bill is made or accepted payable at a particular bank, and the banker is himself the holder at its maturity, we understand the law to be as stated in Bank of U. S. v. Carmeal, 2 Pet. 543, that "no formal demand of payment is necessary; it is sufficient if the note is at the bank and remains unpaid at the expiration of business hours." The indorser as well as the maker or acceptor engages that payment shall be made at the place so named. In the absence of proof to the contrary, it will be presumed that the instrument was there, ready to be delivered upon payment; and if there be no funds left there for that purpose and the maker or acceptor does not there appear and pay it when due, these facts are sufficient proof of a demand and refusal. Byles on Bills, 167; 1 Parsons on Notes and Bills, 365, 371; Edwards on Bills and Notes, 497; Chicopee Bank v. Philadelphia Bank, 8 Wall. 641.

For the proposition that a demand without a tender of the collaterals would be insufficient, counsel cite The Ocean National Bank v. Fant, 50 N. Y. 474. That was a suit against the payee and indorser of a note reciting. on its face that the maker had given him certain bonds as collateral, with power to sell on default. When the notary presented it for payment the maker expressed his readiness and offered to pay it, on the surrender of the collaterals also. They were not produced, and for that reason only he refused to make the payment. The court held that the recital in the note implied an agreement to surrender the collaterals on payment, and that such payment and surrender should be simultaneous; that the

maker's right to them stood upon the same footing with his right to the note, and that he was not bound to pay, with either outstanding and unaccounted for—obviously for the reason that he would thereby, through the fault of the holder, be exposed to further liability or loss—and that this was not such a demand and refusal as was required to make the indorser liable.

The case at bar is radically different. Here the acceptor would have had no right to the collaterals or any of them upon payment of this bill. They were all deposited to secure every dollar of existing indebtedness, whether due or not. Plaintiffs held five other acceptances, then not due, amounting together to some $30,000. The surrender of these securities, or any of them, at that time, would have been a wrong instead of a duty to the indorsers, who might be compelled to pay the others or some of them, and would thereupon be entitled to share in the protection afforded by all of these collaterals, by subrogation. It should be presumed of them as of the bill, that they were in the possession of Beach, Davis & Co., ready to be surrendered to the rightful claimant on payment of the indebtedness to them in full.

Next, it is claimed that if a sufficient demand of payment was made and refused, the indorsers were discharged by the neglect of plaintiffs to give them timely and proper notice thereof. The declaration averred that this was waived by the defendants both before and after maturity of the paper, either of which would suffice; such waiver might be either express, or implied from circumstances—as by payment in part or an absolute promise to pay, made with knowledge of all the material facts operating to discharge him as indorser. Walker v. Rogers, 40 Ill. 278; Givens v. Merchants' National Bank, St. Louis, 85 Ill. 442.

The issue of fact made, then, was not upon the giving, but upon the alleged waiver of notice, and upon that issue there was such a conflict of evidence as to make the duty of the jury to decide it anything but agreeable.

Mr. Davis, the managing partner in the firm of Beach, Davis & Co., testified that, shortly after the first bill matured,

in a conversation with Carlos Wing about what should be done with this paper, he (the witness) said he supposed they would have to protest it; that, on the following day or the day after that, Carlos came into the bank and told him that his brother, the defendant, said it was not necessary to do so, as it would be taken care of; that he was arranging for that purpose; that, within two weeks after the last one matured, he saw the defendant, D. L. Wing, at the office of the milling company, in Litchfield, and told him they would like to have this paper paid or put in more satisfactory shape, and that he supposed they would have to protest it; that they would have done so before, but Carlos had told them that he (Dwight L. Wing) had instructed him to say to them it was unnecessary to do it and that it would be taken care of; that he thought he then asked the defendant specifically if that was correct, and he answered it was, and was positive that he said no protest was necessary on account of the indorsement, "as they were arranging to take care of the paper"—"to take care of it satisfactorily;" that "they were preparing to take care of it through the Planet Mills Company." The witness stated that upon Carlos' report of what defendant had said about the protest, he arranged to see him in person, and got Carlos or somebody at the mill to let him know when he would come up; that the first time he heard of his being there he went to see him and had the conversation related; that he went for the purpose of getting an arrangement or understanding with him about this paper; that he called about five o'clock in the afternoon; that the conversation lasted about a half hour, and was carried on in an ordinary conversational tone; that Carlos was present part of the time, and some others, in and out, whom he did not remember. Mr. Van Deusen also testified to two conversations had with the defendant in the bank—one after some and the other shortly after all of these bills had matured—with reference to them. In the first, he (the witness) insisted that it "ought to be protested in order that notice should be sent to bind the indorsers," but told him that Carlos had stated it was his (defendant's) request that they should not protest it, and he (the defendant) repeated it.

When it had all matured, he called defendant's attention " to that (fact), and also to the necessity of protesting it;" and states that defendant then said " it was not necessary, and that the paper would be taken care of." This was in the back room.

If these statements are true, it is clear that after the paper had all matured, with certain knowledge that he had received no timely notice of its dishonor and with information from the holders themselves that they had taken no steps to give it, the defendant did absolutely waive his right to it and promise to pay them.

He denied that he ever had any such conversation with Davis or Van Deusen, or authorized Carlos to tell them for him what they say he did. He stated that he was not in Litchfield at the time they mentioned. He was there on the 13th of June, which was two days before the first bill became due, and again on the night of the 16th; that he arrived from St. Louis between eight and nine o'clock; went from the train straight to the mill office, where he met certain parties named by appointment; transacted certain business stated; slept at the office and returned to St. Louis by the train that left Litchfield between five and six o'clock the next morning, without going to the bank or meeting Mr. Davis or Mr. Van Deusen; that he again left St. Louis on the 19th or 20th for New York and Massachusetts and returned on the 24th, passing through Litchfield without stopping, and went East again the same evening or the next day; and was not in Litchfield at any time afterward until December. The Wing Milling Company operated the mill there until June 19th, when it was leased to Stonebraker, who took immediate possession. D. L. Wing & Co. had then suspended payment. The term was extended on the 24th, and the Planet Mill Company ran it from about the first of August. It was in connection with these transactions that the several trips mentioned were made, and they enable him to fix the dates given.

Carlos Wing also denied that he was ever authorized by the defendant to make or that he ever did make to Davis or Van Deusen the statement imputed to him in relation to the pro-

test of these bills, and corroborated his brother as to the times when the latter was, and when he was not in Litchfield, from the middle of June to December, 1883. Other persons employed about the mill had no recollection of seeing him there for a considerable time after Stonebraker took possession.

Although both D. L. Wing and his brother testified with confidence that defendant was not there within two weeks or a considerably longer time after June 25th, when the last bill became due, they did not claim to be absolutely certain of it. Their statements were that he was not, " to their recollection," after a long time had intervened. Up to that time his visits were frequent, and it would be remarkable if, with the large interests he had had and the complicated business he had done there, all occasion for them should so suddenly and wholly cease. The capital stock of the Wing Milling Co. in June was $400,000, of which three-fifths were in the name of D. L. Wing, and the residue, excepting three shares of $1,000 each, was held by his partner and co-defendant, Downing. The bills in suit, amounting to $35,000, were all made and matured during that month, as if the company was still prosecuting a very active business. The failure and suspension must have occurred in the midst of large transactions pending and unfinished. One would have supposed that the necessary settlements and arrangements would require a continuance of his visits for a considerable time, and that he would be unable, so long afterward, to remember accurately, when he testified, their number, times or occasions. So, too, of the other witnesses.

Davis and Van Deusen did not pretend to fix the date of the alleged conversations, which was not material; but as to their substance, and the circumstances that anybody would be likely to remember, were entirely positive and certain. They were experienced bank officers, and Van Deusen was also a notary public, used to handling commercial paper and informed as to the rights of parties thereto and the general rules and practice relating to demand, protest and notice of dishonor. They were personally interested in these bills as creditors to the full amount of them, and they are presumed

to be men of fair intelligence and good character.  Their testimony was positive in its nature, while that of the opposing witnesses was negative.  Whether in view of all the circumstances it was easier to believe that Carlos Wing and the defendant made the statements attributed to them, at about the times charged, and had forgotten the facts, or Davis and Van Deusen imagined or deliberately concocted their stories, with all the particulars, out of nothing, and then committed wilful and corrupt perjury in swearing to them, or, if there was no room for the supposition of forgetfulness, which side committed perjury, were questions for the jury.  They returned a special finding as to each of the bills, that D. L. Wing waived notice of its non-payment.  We think that must be conclusive.

Again, it is said the indorsers were discharged as to the drafts of June 2d and 3d, by an extension to the acceptor, without their consent, of the time of payment.  This claim is based on the indorsements thereon of October 7th of credit as for interest to December 1, 1884.  Such a memorandum or receipt is subject to explanation.  Van Deusen explained these.  He made them without special authority or consultation.  The money was the interest due in September on the collateral bonds.  He says his idea at first was that it had been received and should be credited as interest, but, after writing these two receipts, he concluded that was a wrong idea, and so, without erasing what he had written, he credited the others, generally, as they appear.  And clearly it was a wrong idea—inconsistent with the fact and the acts of the bank.

When the first bill matured, Beach, Davis & Co. positively refused to accept a renewal, and gave notice that they would not extend the credit any longer.  So as to the others.  There was no pretense of any subsequent agreement or understanding with the acceptor, drawer or indorsers to give any further time.  These amounts credited as for interest to December 1st, were not in fact so applied.  If for a moment it was so intended by Van Deusen, it was under a mistake or misapprehension from which he recovered before the record he was

making was completed, as is shown by the indorsements on the other bills.

For these reasons we hold that the modification of defendants' instructions on that point was proper. Those given for plaintiffs to the effect that if notice of non-payment was waived proof of demand was unnecessary, stated the law of this case, in which it was conceded that the paper was accepted payable at the bank of the holders. The evidence admitted as to the insolvency of the milling company, so far as we can see, could do no harm; and the affidavits of the jurors were not competent to impeach their verdict.

*Judgment affirmed.*